UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CLINT HARRISON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:12-CV-1372 (CEJ) |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On April 14, 2009, plaintiff Clint Harrison filed an application for supplemental security income, Title VI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of April 1, 1995. (Tr. 116-18). After plaintiff's application was denied on initial consideration (Tr. 42-48), he requested a hearing from an Administrative Law Judge (ALJ). (Tr. 50-54).

Plaintiff and counsel appeared for a hearing on September 30, 2010. (Tr. 29-38). The ALJ issued a decision denying plaintiff's application on January 10, 2011. (Tr. 15-25). The Appeals Council denied plaintiff's request for review on June 12, 2012. (Tr. 1-5). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

## A. Disability Application Documents

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), she is substituted for Michael J. Astrue as the defendant in this case.

In his Disability Report (Tr. 140-47), plaintiff listed his disabling conditions as a learning disability, crooked feet, poor memory, an inability to read, and poor spelling. He stated that he could not stand for longer than 15 minutes because his feet hurt. He had never worked. On March 24, 2010, and September 13, 2010, plaintiff's medications included the antidepressant Citalopram, blood pressure medication, and the anti-inflammatory Naproxen. (Tr. 179-80).

Plaintiff's brother Lance Harrison completed a Third-Party Function Report on April 21, 2009. (Tr. 152-60). According to the report, plaintiff lived with his mother and his daily activities included listening to music, watching television, drawing pictures, and isolating himself from others. He needed reminders to attend to his dress and personal hygiene. He was able to prepare simple meals, such as sandwiches and frozen dinners. He did not perform any household chores. Plaintiff was able to drive and go out on his own. He shopped for clothes and other items every 6 to 9 months. He was not able to pay bills, handle a checkbook or savings account, or count change. He needed reminders to keep appointments. Lance Harrison indicated that plaintiff had no problem getting along with others and stated that he was cooperative with authority figures but did not socialize with other people. He responded to changes in routine by becoming very quiet and submissive. Plaintiff had difficulties with climbing stairs, squatting, walking, talking, understanding, following instructions, completing tasks, memory and concentration. In a narrative section, Lance Harrison wrote that plaintiff has clubbed feet which caused him pain and impaired his ability to walk. He had suffered from asthma in the past and still experienced occasional breathing problems. Plaintiff had difficulty with concentrating, reading and spelling, explaining himself in simple sentences, and holding normal social conversations. He experienced fear, anxiety, and mood swings. (Tr. 159).

-2-

## B. Hearing on September 30, 2010

Plaintiff was 22 years old at the time of the hearing. He was unable to state how far he had gone in school. (Tr. 31). With prompting, he recalled that he had been in special education classes at Sumner High School in the City of St. Louis. (Tr. 32-33). He initially was unable to recall whether he had seen a psychologist for testing but ultimately stated that he remembered " a little bit." In response to questions from his lawyer, plaintiff stated that he believed he had "tried his best" when being tested -- he always tried his best. (Tr. 33-34). The ALJ stated that he would refer plaintiff for additional evaluation.

Dolores E. Gonzalez, M.Ed, a vocational expert, provided testimony regarding the employment opportunities for a 20 year-old individual with a 10th and 11th grade education, including some special education services, with no physical limitations and a limited ability to read. In addition, the hypothetical individual had the ability to understand, remember and carry out simple instructions and non-detailed tasks; take appropriate precautions to avoid hazards; was able to respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent. Ms. Gonzalez was further asked to assume that the individual should not work in a setting that required constant or regular contact with the public and should not perform work that required more than infrequent handling of customer complaints. Ms. Gonzalez opined that such an individual would be able to perform work as a sticker, which is classified as sedentary unskilled work, and as an electrode cleaner, which is light unskilled work. (Tr. 36).

Plaintiff's counsel asked Ms. Gonzalez about the employment opportunities for an individual who is very slow in completing any tasks, and has a poor ability to grasp

-3-

and apply instructions.  Ms. Gonzalez agreed that such an individual would require accommodation to be employable.  (Tr. 37).

## C.  Records

On August 19, 2004, plaintiff underwent a surgical procedure to address significant anomalies in his right foot, including pes valgus (clubfoot).  (Tr. 203-08). There is no indication in the record that plaintiff received subsequent treatment for this condition.

On January 18, 2006, Tom Davant Johns, Ph.D., completed a consultative psychological evaluation of plaintiff.  (Tr. 188-93). Plaintiff was accompanied by his mother, whom Dr. Johns found to be a less reliable informant than plaintiff.  Plaintiff reported that he was in the 12th grade and expected to graduate in the spring.  He had been suspended several times during middle school for fighting and roaming the halls but had not been suspended in the current school year.  Plaintiff admitted to some truancy, talking back, and cursing teachers.  He endorsed multiple behaviors consistent with conduct disorder, including being gone from home overnight without permission, threatening others with violence and weapons, stealing, and lying to avoid the consequences of his actions.  He stated that a Deputy Juvenile Officer had been assigned to him in middle school.  Dr. Johns noted that plaintiff's mother was "incredulous at hearing this."  (Tr. 189).  Plaintiff stated that he had tried both marijuana and alcohol once.

On examination, Dr. Johns noted that plaintiff was marginally groomed and was wearing a soiled t-shirt.  Although minimally cooperative, plaintiff was spontaneous and coherent in verbalizations.  Plaintiff's rate of speech was within normal limits, with normal quantity, quality, and productivity.  His memory was grossly intact.  His mood

-4-

was euthymic with a fair range of affect and he was oriented in an age-appropriate manner.

Dr. Johns attempted to administer the Weschler Adult Intelligence Scale – 3d ed. (WAIS-III) but plaintiff was uncooperative with testing. For example, plaintiff failed the first item of the picture completion subtest, an outcome that is very rare even among mentally retarded claimants. The scores obtained would place plaintiff in the moderate range of retardation, which Dr. Johns found was clearly inconsistent with his presentation, use of language, and reported educational placement. Dr. Johns assessed plaintiff as uncooperative and passively oppositional. After speaking with the Department of Social Services counselor by phone, plaintiff agreed to take the subtest again and proceeded to provide different wrong answers. Dr. Johns diagnosed plaintiff on Axis I with conduct disorder, childhood onset type, and learning disorder NOS, by self-report only. Dr. Johns assigned a Global Assessment of Functioning (GAF) score of 65.[2] Dr. Johns opined was that plaintiff was moderately impaired in his ability to perform adequately in a school setting and in his ability to relate to others.

The next entry in the record is dated January 29, 2009, when plaintiff was seen in the emergency department at Forest Park Community Hospital after he was tasered by police. He was examined and found to be fit for confinement. (Tr. 195-201). On March 24, 2009, he drove himself to the emergency department at Barnes-Jewish Hospital. (Tr. 216-46). He reported that he had been tackled while playing football the night before. He heard a loud pop in his neck and blacked out for a period of time and was experiencing soreness. X-rays of the spine and chest were normal and

[2]A GAF of 61-70 corresponds with "Some mild symptoms . . . OR some difficulty in . . . social, occupational, or school functioning, . . . but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

plaintiff was discharged with prescriptions for Hydrocodone/acetaminophen and a muscle relaxer.

L. Lynn Mades, Ph.D. completed a consultative evaluation on July 21, 2009. (Tr. 248-52). Dr. Mades described plaintiff as a fair informant. Plaintiff stated that he had received special education services for learning and behavioral problems, including some fighting and talking back. He had been suspended but never expelled and had no behavior problems outside of school. He was arrested once for driving without a license or insurance. He did not complete the 12th grade and had not obtained his GED. He reported that he only drank alcohol on holidays and that his last marijuana use was 5 months earlier. He denied all other drug history. He was presently not prescribed any medications. He lived with his mother and took care of some household chores such as washing dishes and taking out the trash. He spent time reading the Bible and watching Christian television.

Dr. Mades noted that plaintiff was well-groomed and casually dressed; his hygiene was within normal limits. His attitude was nominally cooperative and his expression was alert with good eye contact. His posture and gait were within normal limits. Dr. Mades described plaintiff as spontaneous, coherent, relevant, and logical. There were no problems noted with receptive or expressive language ability; his speech was normal in rate and rhythm, without tangents, flight of ideas, or perseveration. His mood was euthymic and his affect full and generally appropriate. There was no apparent mood disturbance and his reality testing was adequate without evidence of a thought disorder. There was no suicidal or homicidal ideation. On examination, plaintiff was oriented in all spheres and his memory seemed to be within normal limits: he could repeat 5 digits forward, name 4 past presidents, and state his date of birth and social security number. He performed simple calculations and

-6-

counted backward from 20 to 1 at a moderate pace without error. His insight and judgment were slightly limited.

Dr. Mades administered the WAIS-III. Plaintiff made a poor effort: he gave several incorrect responses on early items in Picture Completion and his performance on the Coding subtest was much slower during the test than on the sample items given before the test. Dr. Mades telephoned the Department of Social Services counselor. A second attempt was no better and the testing was discontinued. Nonetheless, plaintiff displayed the ability to maintain adequate attention and concentration, with appropriate persistence and pace. Dr. Mades gave plaintiff a GAF score of 75[3] and opined that he had the ability to manage funds should he receive benefits.

On March 11, 2010, plaintiff was seen by Olivera Boskovska, M.D. (Tr. 265-66). He reported that he had pain in both feet, with numbness at the surgical site in his right foot. He rated the pain at 7 on a 10-point scale. He stated that he could not work because he was unable to stand on his feet. He also stated that he had heard voices whispering all the time since his childhood. He might have been prescribed medication in the past but he had not taken it because he was afraid of medicine. Now, his lawyer told him he needed medication. He stated that he had stopped using marijuana a year earlier. Plaintiff was diagnosed with benign essential hypertension and depression and given prescriptions for Celexa, Naproxen, and hydrochlorothiazide. He was referred to podiatry for further evaluation of his feet but forgot to keep the appointment. (Tr. 296).

---

[3]A GAF of 71-80 corresponds with "transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

Plaintiff returned to see Dr. Boskovska on April 15, 2010. (Tr. 267-69). He complained of shortness of breath and tightness in his chest and said that he had stopped taking the blood pressure medication because it made his chest hurt. He reported that he was not depressed. Dr. Boskovska determined that the present dosage of 10 mg of Celexa should be continued without change. On examination, Dr. Boskovska noted some wheezing sounds and thought that it was likely that plaintiff had asthma. Plaintiff was prescribed ProAir and Flovent.

Michael T. Amour, Ph.D., completed a consultative evaluation of plaintiff on May 29, 2010. (Tr. 278-85). He was not provided with plaintiff's academic records. Plaintiff reported to Dr. Amour that he could not remember where he grew up and he didn't know his mother's last name. He could not remember if he had ever run away from home or been in fights. He acknowledged having a friend but was unable to remember whether he had ever had a close friend. He might have started high school but could not recall how much he had completed. He could not recall whether he had ever been drunk. He acknowledged smoking marijuana, but only once. He stated that he had heart problems, asthma and crooked feet. He was prescribed medication because he got angry and confused and heard loud voices. These voices kept him awake at night and told him to take a lot of pills or hurt somebody. He was unable to say whether these voices were inside or outside his head. When asked whether the voices could be speaking a foreign language, he agreed that it "sounds like it sometimes." He reported visual hallucinations in which he saw cartoon characters such as Bugs Bunny and Daffy Duck. He stated that he was depressed and had crying spells.

On examination, Dr. Amour noted that plaintiff's speech was clear but at a very soft volume. Plaintiff did not establish eye contact. At one point during testing,

-8-

plaintiff appeared to fall asleep, gradually falling forward until his head struck the desk. When Dr. Amour first presented the testing materials, plaintiff complained that he could not complete the required tasks. When Dr. Amour suggested terminating the evaluation, plaintiff became angry and said that he would call his attorney. He then agreed to try the testing materials. Plaintiff achieved a Full Scale IQ score of 42 on the WAIS-IV, which Dr. Amour characterized as the extremely low range of intellectual functioning. Based on his inability to report significant details from his past, Dr. Amour posited that plaintiff's long-term memory skills were poor, as were his recent memory, immediate memory, and concentration skills. His insight and judgment were impaired by cognitive deficits and alleged psychotic symptoms. Dr. Amour also noted, however, that plaintiff showed no sign of loose associations, tangential thinking, or circumstantial thinking and displayed no symptoms of thought broadcasting. Dr. Amour diagnosed plaintiff on Axis I with malingering, on Axis II with mild mental retardation versus borderline intellectual functioning and assigned him a GAF score of 40.[4] Dr. Amour described plaintiff as presenting a "diagnostic dilemma" and expressed concern about the adequacy of his effort on the assessment. The claim that plaintiff hallucinated cartoon characters was "difficult to accept."

Dr. Amour completed a Medical Source Statement. (Tr. 287-89). He opined that plaintiff had moderate impairment of the ability to understand, remember, and carry out simple instructions; marked impairments in the abilities to make judgments on both simple and complex work-related decisions, and to understand, remember and carry out complex instructions. He had mild impairment of the ability to interact

---

[4]A GAF of 31-40 corresponds with "some impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

appropriately with the general public and moderate impairment in the ability to interact appropriately with supervisors and co-workers. He had marked impairment in the ability to respond to usual work situations and to changes in routine work settings. However, Dr. Amour noted that, "[m]alingering must be considered."

On June 16, 2010, Dr. Boskovska noted that plaintiff was not depressed. (Tr. 296-97). He was oriented to person, place and time and was in no distress.

On September 15, 2010, plaintiff was transferred to the St. Louis Metropolitan Psychiatric Center (SLMPC) from the emergency room at St. Mary's Hospital. (Tr. 305-11). It was reported that plaintiff had a history of chronic schizophrenia with recent worsening of paranoia and voices telling him to harm himself. Mehret Gebretsudik, M.D., diagnosed plaintiff at admission with chronic paranoid schizophrenia and cannabis abuse, with rule-out diagnoses of depression and borderline intellectual functioning.[5] Plaintiff reported that his mood had been depressed for 1 or 2 days, but denied experiencing other symptoms of depression such as decreased energy, changes in self care, increased guilt, anhedonia, helplessness, or guilt. He denied experiencing suicidal ideation or manic episodes. He reported that his appetite and sleep had decreased since he ran out of his medication a month earlier. Plaintiff was released the following day.[6] The discharge physician noted that although plaintiff complained of worsening symptoms his history was inconsistent with psychotic symptoms. Plaintiff

---

[5]The ALJ and plaintiff both misread the date of Dr. Gebretsudik's report as September 17, 2010, thus mistakenly placing it after plaintiff's discharge from inpatient treatment. A review of the document clearly shows the date was September 15, 2010, and that its purpose was to determine whether admission was appropriate. See Tr. 310. By the next day, it had been determined that inpatient treatment was not appropriate and plaintiff was discharged with a prescription for Celexa and a recommendation to start outpatient treatment. See Tr. 306.

[6]Plaintiff stated that he wanted to go home to be with his 2-year-old daughter. See Tr. 306.

was "vague and inconsistent about his history"[7] and it was possible that he was malingering to obtain disability. He was discharged with prescriptions for Abilify and Celexa. His diagnoses at discharge were depression NOS, rule out malingering, and cannabis abuse. His GAF score at discharge was 51-60.[8]

On November 13, 2010, Shannon Nanna, Psy.D., completed a consultative evaluation of plaintiff. (Tr. 312-15). Plaintiff was driven to the appointment by his mother. He was casually dressed with his hygiene and grooming within normal limits. His gait was normal. He told Dr. Nanna that he had memory problems and was depressed. He reported that he had attempted suicide "a long time ago," but was unable to clarify the manner of the attempt or when it occurred. He reported that, since he was a teenager, he has heard voices telling him what to do and what not to do. Dr. Nanna did not observe any behaviors consistent with someone responding to hallucinations. Plaintiff stated he left school in tenth grade but could not remember the reason he left or anything about his learning disabilities.

Dr. Nanna observed that plaintiff made poor eye contact and his affect was blunted. He had no difficulties with receptive or expressive language ability, although his speech was limited. He was alert and oriented. She described his cooperation as impaired and noted that he was able to repeat 1 out of 6 digits going forward and was unable to name the current governor, mayor, or president, and was unable to name past presidents. He also performed poorly on tests of judgment and proverb

---

[7]For instance, plaintiff reported that he had been born and raised in New York, and moved to St. Louis in 9th grade. He denied having children (see note 6). He told other evaluators he was born in St. Louis. See, e.g., Tr. 313.

[8]A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (E.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

interpretation.  Dr. Nanna decided not to administer the WAIS again because plaintiff had taken it three times since 2006 and scores would not be considered valid.  She instead gave plaintiff the Test of Memory Malingering (TOMM).  His scores on this test, as well as his history, strongly indicated that he was malingering.  Dr. Nanna diagnosed plaintiff on Axis I as malingering and assessed his GAF at 75.

### III.  Evidence Submitted to the Appeals Council

Plaintiff submitted an Individualized Education Plan (IEP) completed by the St. Louis Public Schools in February 2006.  (Tr. 333-47).  His educational diagnosis was emotional disturbance.  Ms. Walker, plaintiff's special education teacher, noted that plaintiff struggled with maintaining pace and had difficulty comprehending presented material.  He had a low frustration tolerance and needed to be reminded to stay on task.  He related appropriately to peers and adults.  It was determined that plaintiff should attend regular education classes a portion of the school week, with special education instruction focused on math, written language, and reading.  (Tr. 341). Assessment forms from the 2005-06 academic year show that plaintiff made consistent progress toward his IEP annual goals until February 2006; thereafter, he was assessed as "not making progress."  (Tr. 336-38).  Forms completed in March 2006 reported that plaintiff's speech and language were "age appropriate," he was in the low average range of cognitive functioning, and his adaptive behaviors were commensurate with his cognitive ability.  His attendance was poor.  (Tr. 323-28).

Dr. Mades performed another consultative evaluation on January 27, 2011.  (Tr. 353-58).  Plaintiff reported that he could not focus and had a "bad memory."  His other reported symptoms were shaking, fear of the dark, fear that everyone hated him, and a depressed mood.  He stated that he heard voices like cartoon characters.  Indeed, he stated, he had just heard such a voice "a couple of minutes ago."  The voices were

both inside and outside his head and made him afraid to sleep. He was not on any medication at the time. Dr. Mades described plaintiff as casually dressed and well-groomed with hygiene within normal limits. His posture and gait were normal. He was generally cooperative and alert with good eye contact. His speech was normal in rate and rhythm and he was spontaneous, coherent, relevant, and logical. Plaintiff's mood was euthymic and his affect was slightly restricted but generally appropriate. Dr. Mades noted that plaintiff's claimed auditory hallucinations were highly atypical and equivocal and thus not credible. Plaintiff's reality testing was adequate and there was no indication of a thought disorder.

Dr. Mades administered the Miller Forensic Assessment of Symptoms Test (M-FAST). Plaintiff's score on this test was consistent with exaggeration of symptoms and/or malingering. Plaintiff showed inconsistencies between reported and observed behaviors, claimed extreme symptoms, endorsed unusual hallucinations, and claimed unusual symptom combinations. Dr. Mades also administered the WAIS-IV, on which plaintiff obtained a Full Scale IQ score of 70. He displayed variable persistence and fair frustration tolerance. After he was confronted about his effort, his performance appeared to improve but fell off again. Dr. Mades opined that his effort appeared to be better than on previous administrations but was still inconsistent and not optimal. The results therefore were considered to be minimal assessment of plaintiff's current level of cognitive functioning, which was within the borderline range of functioning overall. There were no significant strengths or weaknesses noted. Despite plaintiff's claims of memory problems, there was no clear evidence of this issue during the exam. Dr. Mades administered the TOMM to assess plaintiff's motivation and effort. He scored poorly on the test. Dr. Mades diagnosed plaintiff on Axis I with cannabis abuse

and malingering and on Axis II with antisocial personality disorder. She assessed his GAF at 85.

Dr. Mades completed a Medical Source Statement. (Tr. 359-61). She found that plaintiff had no impairment in the ability to understand, remember and carry out instructions. He had mild impairments in ability to interact appropriately with public, supervisor, and co-workers, and respond appropriately to usual work situations and changes in routine work setting.

On February 27, 2012, Rachel Morel, D.O., completed a Mental Residual Functional Capacity Questionnaire. (Tr. 7-11). Dr. Morel stated that she had seen plaintiff monthly since October 11, 2011. She diagnosed plaintiff with schizoaffective disorder and cannabis abuse and assigned him a current GAF of 40; his highest GAF in the past year was 45. His medications included Invega,[9] Celexa, and Cogentin.[10] Dr. Morel stated that plaintiff was responding "minimally" to the medications "as his avolition causes problems with medication adherence." Dr. Morel described plaintiff as "very isolative and irritable" as a result of his paranoia, which would affect his interactions with the public and co-workers. He would miss several days of work a month due to his avolition. Dr. Morel endorsed several symptoms: anhedonia; decreased energy; blunt, flat or inappropriate affect; poverty of content of speech; mood disturbance; difficulty thinking or concentrating; psychomotor agitation or retardation; persistent disturbances of mood or affect; paranoid thinking or

---

[9]Invega, or Paliperidone, is an atypical antipsychotic used to treat the symptoms of schizophrenia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a607005.html (last visited on Apr. 10, 2013).

[10]Cogentin, or Benztropine Mesylate, is used to treat the symptoms of Parkinson's disease and tremors caused by other medical problems or drugs. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682155.html (last visited on Apr. 10, 2013).

inappropriate suspiciousness; emotional withdrawal or isolation; perceptual or thinking disturbances; hallucinations or delusions; catatonic or other grossly disorganized behavior; pathologically inappropriate suspiciousness or hostility; and oddities of thought, perception, speech or behavior.  Dr. Morel indicated that plaintiff had no useful ability to function with respect to 24 different abilities or aptitudes and stated that he was unable to meet competitive standards of neatness and cleanliness.  She also found, however, that he did not have a low IQ or reduced intellectual functioning and had the capacity to manage his own benefits. She opined that he was not a malingerer.  The Appeals Council noted that Dr. Morel began treating plaintiff well after the ALJ issued his decision and concluded that her report was not relevant to determining whether plaintiff was disabled on or before January 10, 2011.  (Tr. 2).

## IV.  The ALJ's Decision

In the decision issued on January 10, 2011, the ALJ made the following findings:

1.    Plaintiff has not engaged in substantial gainful activity since April 1, 2009, the application date.

2.    Plaintiff has the following severe impairments: depression and cannabis dependence.

3.    Plaintiff does not have an impairment or combination of impairments that meets or substantially equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.    Plaintiff has the residual functional capacity to perform a full range of work at all exertional levels with the following nonexertional limitations: he is able to understand, remember, and carry out at least simple instructions and non-detailed tasks; respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent; and take appropriate cautions to avoid hazards. He should not work in a setting that included constant and/or regular contact with the general public and involved more than infrequent handling of customer complaints.  He should not work at a job which requires more than limited reading skills.

5.    Plaintiff has no past relevant work.

6.  Plaintiff was 20 years old, a younger individual, when the application was filed.

7.  Plaintiff has limited education and can communicate in English.

8.  Transferability of job skills is not an issue because plaintiff does not have past relevant work.

9.  Considering plaintiff's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

10. Plaintiff has not been under a disability, as defined in the Social Security Act, from April 1, 2009.

(Tr. 18-25).

## V.  Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion."  Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)).  If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

In this case, new evidence was submitted to and considered by the Appeals Council.  The regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision.  20 C.F.R. § 404.970(b); Cunningham v. Apfel, 222 F.3d

496, 500 (8th Cir. 2000). The newly submitted evidence becomes part of the administrative record, even though the evidence was not originally included in the ALJ's record. Id. This Court does not review the Appeals Council's denial but determines whether the record as a whole, including the new evidence, supports the ALJ's determination.

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security

-17-

Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v.

Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## VI. Discussion

Plaintiff argues that the ALJ erred in finding that his impairments did not meet or medically equal a listed impairment; that the ALJ incorrectly determined his residual functional capacity (RFC); and that the hypothetical posed to the Vocational Expert did not reflect his actual limitations.

### A. Listing 12.05C

Plaintiff argues that the ALJ erred at step 2 of the sequential analysis. In particular, he argues that the ALJ erred by failing to properly consider Dr. Amour's assessment of plaintiff's limitations and by failing to explain why plaintiff's conditions did not meet or equal the listing for mental retardation, Listing 12.05C.

The ALJ determined that plaintiff did not meet or medically equal any listing-level impairment, but did not specifically address Listing 12.05C.[11] However, there is no error when an ALJ fails to explain why an impairment does not equal a listed

_____

[11]The ALJ did specifically considered the listing for affective disorders, Listing 12.04, and concluded that plaintiff did not meet the criteria, a finding that plaintiff does not challenge.

-19-

impairments as long as the overall conclusion is supported by the record. <u>Boettcher</u> <u>v. Astrue</u>, 652 F.3d 860, 863 (8th Cir. 2011).

> Listing 12.05C states as follows:
>
> Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements of A, B, C, or D are satisfied.
>
> * * *
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

Dr. Amour assigned plaintiff a qualifying IQ score of 42. However, as the ALJ noted, Dr. Amour questioned the validity of the score based, in part, on plaintiff's poor effort. Ultimately, Dr. Amour was unable to ascertain whether plaintiff's cognitive functioning fell within the mild retardation or the borderline intellectual functioning range. Similarly, Dr. Mades assigned plaintiff an IQ score of 70, at the top end of the qualifying range. However, Dr. Mades described this outcome as a minimum assessment of plaintiff's cognitive ability, based on plaintiff's poor effort.

The record supports a conclusion that these IQ scores are not valid. The testers, who had the benefit of observing plaintiff, expressed reservations about his effort during testing. Neither Dr. Johns or Dr. Morel believed that plaintiff met the criteria for retardation. Furthermore, education records establish that plaintiff was diagnosed as emotionally disturbed rather than cognitively impaired or learning disabled; indeed he was assessed within the low average range of cognitive abilities. Dr. Amour did not have the benefit of reviewing these records.

Evidence in the record as a whole supports the conclusion that plaintiff's impairments do not meet or medically equal Listing 12.05C.

## B. The RFC Determination

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." Id. (citation omitted). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Id. Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)).

## Credibility

As part of his RFC analysis, the ALJ addressed plaintiff's statements regarding the intensity, persistence and limiting effects of his symptoms and concluded that they were not entirely credible. (Tr. 23).

In addressing plaintiff's credibility, the ALJ considered the reports of the consultative examiners: In 2006, Dr. Johns noted that plaintiff's functioning at school had improved since middle school and assigned plaintiff a GAF score of 65, which is indicative of mild difficulties in functioning. In 2009, Dr. Mades found no evidence of a mood or thought disorder and assessed plaintiff's GAF at 75, which is indicative of slight difficulties in functioning. In May 2010, Dr. Amour diagnosed plaintiff with malingering and mild mental retardation versus borderline intellectual functioning and questioned plaintiff's account of visual hallucinations. He assigned a GAF of 40, which

-21-

is indicative of major difficulties in functioning.  In September 2010, plaintiff was admitted to the SLMPC with complaints of worsening symptoms since he had stopped taking medication.  Although he was diagnosed at admission with chronic paranoid schizophrenia, he was discharged the following day with a diagnosis of depression and a question of possible malingering in order to obtain disability benefits.  In November 2010, Dr. Nanna administered a test for malingering; based on her observations and the test results, she diagnosed plaintiff with malingering and assigned a GAF of 75.

The ALJ concluded that the consultative evaluations failed to support a finding of disability.  The ALJ noted that no physician ever recommended that plaintiff not seek employment.  Further, plaintiff's sole psychiatric hospitalization was brief and occurred when he was noncompliant with medication.  The ALJ afforded little weight to the GAF scores assigned by the medical experts because they were each based on one visit without the continuity of regular medical care and continuous compliance with treatment.

Plaintiff argues that the ALJ improperly relied on the report of Dr. Nanna because she administered the TOMM, a test of malingering.  Plaintiff notes that the Commissioner does not support the use of tests for malingering.  However, there is sufficient support for a finding of malingering absent plaintiff's results on the TOMM test.  In particular, Dr. Amour and the discharge physician at SLMPC both cited possible malingering, based upon their independent observations of plaintiff, without relying on the TOMM.

The Court finds that substantial evidence in the record as a whole supports the ALJ's credibility determination.

## The RFC Determination

The ALJ determined that plaintiff is able to engage in a full range of work with the nonexertional limitations set forth above. Plaintiff argues that the ALJ discredited all of the consultative evaluations and thus there is no medical evidence in the record to support the RFC determination. However, "the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." <u>Vossen v. Astrue</u>, 612 F.3d 1011, 1016 (8th Cir. 2010). In determining a claimant's RFC, the ALJ may not disregard evidence or ignore potential limitations, but is not required "to mechanically list and reject every possible limitation." <u>McCoy v. Astrue</u>, 648 F.3d 605, 615 (8th Cir. 2011).

Dr. Amour found that plaintiff had greater nonexertional limitations than the ALJ did. Plaintiff argues that the ALJ erred in rejecting Dr. Amour's limitations as they are consistent with findings by the SLMPC and Dr. Morel. However, as discussed above, Dr. Amour questioned some elements of plaintiff's presentation. The SLMPC diagnosis detracts from plaintiff's disability claim and Dr. Morel's findings were made well after the ALJ's decision and thus are not relevant to determining whether plaintiff was disabled for the time period under consideration. More substantively, the record does not include Dr. Morel's treatment notes and contemporaneous observations and thus there is insufficient information supporting her conclusions. Finally, the severity of the impairments as found by Dr. Morel are inconsistent with her assessment that he has the capacity to manage his own benefits.

Plaintiff's contention that there is no evidence in the record to support the ALJ's RFC determination is incorrect as the RFC determination is consistent with the educational records. Plaintiff's claim that his RFC was improperly determined will be denied.

### C. <u>The Hypothetical Submitted to the Vocational Expert</u>

Plaintiff argues that the hypothetical submitted to the vocational expert did not accurately reflect his impairments and thus the ALJ should not have relied on her testimony. A hypothetical is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001). The Court has determined that the ALJ's RFC determination is supported by substantial evidence and thus rejects plaintiff's challenge to the hypothetical.

## VII. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 26th day of June, 2013.